UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| United States of America, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 20-30033-MGM |
| JOSEPH WILLIAMS, | ) | |
|     Defendant | ) | |

### SENTENCING MEMORANDUM

For his participation in this wire fraud conspiracy, Joseph Williams asks this Court to impose a probationary term no greater than the three years of probation imposed on co-defendant Herbert Wright. In significant ways, the two stand in nearly identical shoes for purposes of sentencing. They both began their lives in the same crime-ridden neighborhood of Chicago. They both harbored dreams of successful careers as hip hop artists, though Mr. Wright has realized far more financial success than Mr. Williams. They both connected with promoter and co-defendant Antonio Strong, who devised a criminal scheme to fund the artists' travel (flights and hotels for Mr. Williams) with stolen credit cards obtained from the dark web. And they both knowingly reaped these benefits, thus participating in this conspiracy, though unlike the other co-defendants, neither procured the stolen cards nor distributed them to others. Even the loss attributable to the two artists is very close ($155,392.81 for Mr. Williams; $139,968 for Mr. Wright).

In other ways, Mr. Williams merits a lesser penalty than Mr. Wright. Mr. Wright was also convicted of making false statements in violation of 18 U.S.C. § 1001(a)(2), whereas Mr. Williams made no false statements. Mr. Wright came before this Court with a prior gun conviction, whereas Mr. Williams has but a single conviction for driving with a suspended license when he was 18 years old. Because of this difference in their criminal history, Mr. Wright had an Advisory Sentencing Guideline range of 12 to 18 months, whereas Mr. Williams, according to the Government and Probation, has an Advisory Sentencing Guideline range of 10 to 16 months.[1] And Mr. Wright picked up a second gun charge and repeatedly tested positive for drug use while on release, whereas Mr. Williams has engaged in no criminal conduct in the 3½ years since his arrest. Thus, there is no reason why Mr. Williams should receive a sentence of incarceration when Mr. Wright did not.[2]

In pleading guilty, Joseph Williams has taken responsibility for his criminal conduct. He now fully understands the harm he caused to real people whose businesses lost substantial money, which he did not truly appreciate at the time. He too has lost a lot since his arrest – his sense of personal and family safety as well as

---

[1] As noted below and in Mr. Williams' objection to the PSR, he maintains that he should receive a two-point reduction in his total offense level under the "minor participant" provision of USSG § 3B1.2(b), which would reduce his advisory range to 6 to 10 months.

[2] Admittedly, Mr. Wright was able to pay his full restitution and forfeiture prior to his sentencing hearing, in addition to donating substantial money to charitable causes. However, the fact that Mr. Wright has achieved greater financial success than Mr. Williams should not result in a harsher penalty for Mr. Williams. Punishing him more harshly for having less money than Mr. Wright would be deeply unfair.

professional opportunities when he was falsely labeled a cooperator; his father, who passed away in September of 2021; and most devastatingly, his mother, his biggest champion and best friend who died of a prolonged illness in May of 2022. Nonetheless, Joseph has persevered, continuing to pursue his musical career and remaining an involved and wonderful father to his now three-year-old daughter Jolie and six-year-old son Joseph, Jr.

Even with a sentence of probation, he will pay an ongoing price for his poor decision-making, saddled with limitations on his liberty, serious financial obligations, and all the consequences of a felony conviction. A probationary sentence is fair and appropriate. It is consistent with the sentence imposed on both co-defendant Wright and the majority of similarly-situated defendants, according to the Judicial Sentencing Information. And it avoids the harm that incarceration would cause his girlfriend and their children. In short, the requested probationary sentence is "sufficient but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

1. Growing up in Chicago

Mr. Williams' life history is such that it is understandable, though not excusable, that he got caught up in this scheme.

Joe was born in Chicago on September 9, 1992, the second of five children born to his mother, Joanne Green. *See* PSR ¶¶ 46, 50-53. His mother and father, Raymond Williams, divorced when Joe was about ten years old, and his father moved out of state and was out of touch for a number of years. *See* Exhibits 1, 2. He

did return, and Joe and his older sister Jarae then lived with their father for a couple of years, before returning to live with their mother and her new husband. *See* Exhibit 1. Later, Joe's relationship with his father was "off and on," though it became stronger in the time after this case began. Sadly, Raymond Williams passed away in September of 2021, which took a toll on Joseph. *See* Exhibits 1, 2.

It was Joe's mother who was his rock, his best friend, and his "biggest fan."



Exhibit 2. Joseph, his mother, and sisters lived in the housing projects at 80th Street and Crandon Avenue. These projects stand just two blocks from a neighborhood that bears the unfortunate but telling nickname of "Terror Town," which was considered in the 1990s "the most violent and impoverished area of South Shore," plagued by drugs, gangs, and street violence. *See* https://www.chicagoganghistory.com/neighborhood/south-shore/ (last visited April 25, 2023). But Joe's mother was deeply connected to the church, specifically the King of Glory, Church of God in Christ (pictured here), where his maternal uncle served as a pastor. *See* Exhibit 2.

Joe attended church every Sunday, bible school in the summer, and the Christian Lutheran School for middle school. *See* Exhibits 1, 2. He also did custodial work at his godmother's hair salon and even helped out with a non-profit she ran that was involved in anti-violence initiatives, including providing services to former

gang members. *See* Exhibit 3. Joseph's maternal grandmother, Denise Hodges, also played a big role in his upbringing. *See* Exhibit 1. Ms. Hodges was active in the civil rights movement, marching with Dr. Martin Luther King, Jr. and later working as a cook for the Reverend Jesse Jackson. *See id.* Her death, when Joseph was in his late teens, was very difficult for him. *See* Exhibit 2.

Despite growing up in such a challenging neighborhood, Joe steered clear of any trouble. His sister Jarae describes him as a quiet kid who followed his mother's strict rules and did not "hang out with the bad kids." Exhibit 1. Joe's younger sister, Janella, remembers him as a gentle kid who "never put his hands on anyone." Exhibit 2.

### 2. Pursuing a Career in Music

Eventually, Joseph's mother moved the family to the suburb of Crete, Illinois, to remove her children from the negative influences of their Chicago neighborhood and enable them to attend a better high school, Crete-Monee High School. *See* PSR ¶¶ 46, 63; Exhibit 1. It was there that Joseph first developed his interest in music. He began by recording at friends' houses and performing at open mics. *See* Exhibits 1, 2.

Joseph's mother greatly appreciated her son's passion for and talent in music, so she began driving him to performances and built him a studio in her home. *See* Exhibit 2. Joseph's sister Janella calls their mother his "biggest fan," who acted as his "manager" in those early days of his musical career. *Id.* Joanne Green even had an Instagram page under the moniker "mommarodie", pictured here.



Joseph expressed his deep love for his mother in his music, in songs such as "Momma Straight" (https://www.youtube.com/watch?v=Fs6xGKSjou8), "Emergency" (https://www.youtube.com/watch?v=nzH8KjtbgNU), and, following her death, "Joanne Son" (https://www.youtube.com/watch?v=9vb5H2v0y1A).

Joseph won an open mic competition that led to his being invited to open shows for highly successful rappers Lil' Wayne and Gucci. He then met Antonio Strong, a promoter with serious connections in the industry. *See* PSR ¶ 8. Joseph believed that Strong would help him become a truly successful hip hop artist.

In 2016, Mr. Williams, then performing under the name Jo Rodeo, released his biggest hit, "Come Wit Me," which featured the rapper Future and has garnered 4.5 million views on youtube.[3] This is Joseph in 2019.



### 3. The Fraudulent Scheme to Fund Joseph's Travel

Antonio Strong's scheme to help Joseph achieve hip hop stardom included funding his travel – flights and hotels – with stolen credit card information that Strong and others purchased on the dark web. *See* PSR ¶¶ 8-18. The Government recognizes that Joseph Williams played no role in procuring the stolen credit cards and that, although Strong did send him stolen credit card information, Mr. Williams never disseminated this illicit information to anyone else. *See* PSR ¶ 12. Moreover, the discovery demonstrates that most of the arrangements for Mr. Williams' travel were made by others, mostly Strong.

Mr. Williams acknowledges that he was a knowing beneficiary in this scheme, which makes him guilty of conspiracy, but he played a far smaller role than other defendants did in using the credit cards. For example, on October 18, 2017, Antonio Strong sent Joseph Williams a text that included screen shots of five stolen

---

[3] *See* <https://www.youtube.com/watch?v=C4M9ZPWXmXs> (last visited June 19, 2024).

credit cards along with a message to "order some pizza an stuff." *See* PSR ¶ 15. That same day, one of those cards was, in fact, used to purchase food (totaling $171) at a bar/restaurant in Chicago. *See id.* However, on that same day one of those cards was used to spend over $17,000 for a private jet, and the Government acknowledges that Mr. Williams was not involved in that fraudulent purchase. *See id.* n.1. Indeed, text and email communications provided in discovery make clear that even when Mr. Williams' travel was paid for with stolen card information, it was co-defendants other than Mr. Williams who made most of those arrangements and transactions.

This is not to say that Joseph Williams was blameless. But his role was lesser than others, with the exception of Herbert Wright, whose role was virtually identical to that of Mr. Williams. For these reasons, Mr. Williams has asked this Court to grant him a "minor participant" reduction in calculating his total offense level under the Sentencing Guidelines, pursuant to USSG § 3B1.2(b). In sum, Joseph's decision to follow the lead of a successful promoter down this illegal path was a terrible mistake, but somewhat understandable for a young man trying to achieve his dreams.

### 4. The Impact of the Indictment

The indictment was devastating. Joseph truly believed that Antonio Strong would lead him to stardom. But now those dreams were in tatters.

Joseph also came to recognize that these crimes had real consequences for the individuals and entities who were victimized. Harming others was never his intent,

but he does now understand the real harm he caused these victims, and he is deeply remorseful.

And Joseph felt ashamed, particularly with respect to his biggest fan – his mother. Life was already extremely hard for her. She suffered from several severe ailments, including a rare neurological condition that, at a certain point, deprived her of the ability to walk, talk, and care for herself. *See* Exhibits 1, 2, 3. She underwent multiple surgeries, spent months at a time in the hospital, and was even on life support at one point. *See* Exhibit 1. Joseph's sister Janella discussed how tough their mother's illness was on Joseph, who previously spoke with his mother every day. *See* Exhibit 2. His sister Jarae described the illness as overwhelming to Joseph, though he visited her in the hospital frequently. *See* Exhibit 1. And Kashai Collins, Joe's godmother and his mother's best friend, related that when his mother was not in the hospital, Joe would do her grocery shopping and even change diapers she had to wear. *See* Exhibit 3. As Joseph sings in his song "Emergency," "I come with urgency. Every day I gotta get up and think about my momma's surgery." Burdening his mother further with the stress of his arrest took a severe toll on Joe, though he continued to support her as much as he could.

Then, a prominent rapper released a song referencing Joseph in relation to this fraud scheme that made listeners believe he was a "snitch," even though neither he nor any other defendant engaged in cooperation with the Government. This further harmed his career prospects and led him to fear for his safety and that

of his family, particularly given some of the dangers that exist in his hometown of Chicago.



In February of 2021, Joseph sought and obtained the Court's permission to move to Florida, both to avoid the dangers in Chicago and to reside with his girlfriend, Ashley Crudup, and their two young children, Joseph Williams, Jr., who was 3½ at the time (dob: 6/15/17) and Jolie Williams, who was born just days after Mr. Williams' initial appearance (dob: 11/27/20). *See* PSR ¶¶ 55-56. Here is the family around that time.

Since his move to Florida, Joseph has resided with Ms. Crudup, their kids, and, for some of his time there, Ms. Crudup's parents, Michael and Latoya Crudup. *See id.* Ashley states that Joseph "plays a major role in raising our 2 kids and being a family man," and that the kids "are super attached to their father who is more than active in their lives." Exhibit 4. Ashley's parents write that the kids "look up to him," that "he is always with them," and that he "helps his son . . . with his homework every day after school" and "teachers [his daughter] something new every single day." Exhibit 5. They state that he is "always with his family doing activities such as taking them to the local park, kidz fun zone, water park, and library." In sum, they describe him as a "caring loving family man." *Id.*

Below are photos of Joseph and his children:



In September of 2021, Joseph suffered a huge loss when his biological father passed away. *See* Exhibit 1. His passing was all the more painful because, following the indictment, he and Joseph had begun to develop a closer relationship than they had in the past. *See* Exhibit 2. Less than a year later, in May of 2022, Joseph's beloved mother succumbed to her debilitating neurological disease. *See* PSR ¶ 48. Joe was beyond devastated. He considered giving up on his musical career. He even pondered suicide.

But eventually he rallied, for his own sake but also for his family. He reengaged in pursuing his dream of success as a musical artist. *See* Exhibit 4. The first song he recorded was entitled "Joanne Son," a tribute to his relationship with his mother and the strength she gave him to push forward. In it, he sings,

> I'm afraid to give up.
> Just think about what my momma said,
> N* pick your chin up
> When you fall down you better get up

In the ensuing two years, Joseph has pursued opportunities to record and perform his music, though it has been challenging in light of the pretrial restrictions on travel, which have required seeking the Court's permission each time such an opportunity arises. Thus far, his efforts have not borne the fruit that Mr. Wright (aka G Herbo) has achieved. While Mr. Wright has attained true star status and the resulting financial rewards, which enabled him to generously donate substantial money to worthy charities and pay his full restitution and forfeiture prior to his plea, Mr. Williams scratches out meager sums for his efforts and struggles to make ends meet. *See* Exhibits 6, 7.

Yet he perseveres. Most importantly, he continues to play an extremely active role in the lives of his two young children, as well as his extended family. *See* Exhibits 1, 2, 3, 4, 5, 8. As Ashley writes, "Despite the recent loss of both his mother and father just 6 months apart last year, that has taken a huge toll on him yet he still continues to keep his head high and be a positive role model for our kids." Exhibit 4. His sister Jarae describes him as a "loving" "24/7" father. Exhibit 1. His godmother, who has seen him with his children, characterized him as "very caring, loving, and playful with his kids." Exhibit 3. And sister Janella explains that Joseph is not only "an amazing father" to his own children, but also how "Uncle Rodie" is "like a dad" to her two young children, whose own father passed away. Exhibit 2. Janella's daughter suffered brain damage that left her partially paralyzed, blind,

and unable to speak, and Joseph speaks to her regularly and cares for her when he visits; he also "video calls" with her son twice a week and takes him for a month each summer. *See id.*

### 5. Reasons to Impose a Probationary Sentence

There are multiple, compelling reasons this Court should impose a sentence of probation rather than incarceration.

First, sending Mr. Williams to prison, even for a short duration, is unnecessary to accomplish the goals of sentencing. When Congress enacted the Sentencing Reform Act of 1984, it intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of non-violent and non-serious offenders, the interests of society as a whole as well as individual victims of crime an continue to be served through the imposition of alternative sentences, such as restitution and community service." Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987, 2039 (1984). Here, the crime, although serious in its financial impact, was not violent. Nor is there any indication that Mr. Williams himself is violent (he is the opposite) or poses a further danger to the community. The now 3½ year period of pretrial supervision, which has limited Mr. Williams' travel and professional opportunities, has already sent him a strong message that he needs to avoid any future criminal conduct. A further period of post-conviction supervision would strengthen that message. Moreover, incarceration would impair his ability to

pursue professional opportunities that might enable him to pay any restitution that is owed.

Second, Mr. Williams has no meaningful criminal history prior to this. His only conviction is for driving with a suspended license at age 18. *See* PSR ¶ 37. His lack of a significant record is a testament to his good character, which is even more evident from the love and kindness he has always exhibited toward his family and community. And in the 3½ years since his indictment in this case, he has remained in the community and out of any further trouble, again demonstrating that he is not a danger to the community. In *United States v. Howe*, 543 F.3d 28 (3d Cir. 2008), the Third Circuit held that a District Court judge's imposition of a two-year probationary sentence for two counts of wire fraud, committed by a business owner who then went to great lengths to cover up his fraud, was reasonable. The Court relied on seven reasons that justified the downward departure and probationary sentence: "(1) Howe 'led an honorable and lawful life until this point' and had no prior criminal history; (2) Howe 'served in the U.S. Military for 20 years'; (3) Howe was a 'well-regarded member of [his] community'; (4) Howe 'regularly attend[s] church'; (5) Howe was a 'devoted husband, father, and son'; (6) Howe made but an 'isolated mistake' in committing his crime; and (7) Howe was remorseful at sentencing." With the exception of military service, each of these reasons for a probationary sentence are also present for Joseph Williams.

Third, Mr. Williams' culpability in this scheme is less than other co-defendants and equivalent to that of Mr. Wright, who received probation. Mr.

Williams did not procure the stolen credit cards, did not transmit stolen credit cards to others, and though he knowingly benefited from the scheme, he did not personally make most of the financial arrangements from which he benefited. Indeed, Mr. Williams contends that he is deserving of a two point "minor participant" deduction on his Sentencing Guidelines offense level calculation.

Fourth, according to the Judicial Sentencing Information, 52% of similarly-situated defendants across the country over the past five years have received sentences that do not involve a period of incarceration.[4] *See* PSR ¶ 83. There is nothing about Mr. Williams or his criminal conduct that should place him in the minority of offenders who do receive a prison sentence.

Fifth, as outlined above, the circumstances that led to his involvement in this criminal scheme provide a context that renders his conduct understandable, though not excusable.

Sixth, incarcerating Mr. Williams would harm his family. The National Institute of Justice, within the Department of Justice, has recognized that children of incarcerated individuals are "hidden victims" whose "parent's incarceration poses several threats to a child's emotional, physical, educational, and financial well being." *See* Eric Martin, "Hidden Consequences: The Impact of Incarceration on Dependent Children" (March 1, 2017).[5] As described above, Joseph Williams has

---

[4] Even for the minority of similarly-situated defendants who did receive a sentence of incarceration, the average sentence was 7 months and the median was 6 months, both below the advisory guideline range. *See* PSR ¶ 83.

[55] Located at https://nij.ojp.gov/topics/articles/hidden-consequences-impact-incarceration-dependent-children (last visited June 17, 2024).

-15-

two young children, now 6-year-old Joseph Jr. and 3-year-old Jolie, whom he is raising along with their mother. His siblings, particularly his sister Janella and her children, also rely on Joseph. Losing him to prison for any period of time would be painful for them all and could even stigmatize his children in ways that could last well into the future. Additionally, harm to his professional prospects would negatively impact his children. As his in-laws write, "I only can wish and hope that he continues to be around for his family who loves and depend on him. His family needs him. I don't know how they are going to manage things without him." Exhibit 5. That is why Ashley asks for grace "for the sake of him and our family." Exhibit 4.

For all of the above reasons, Joseph Williams asks this Court to impose a sentence of probation of no more than three years.

Respectfully submitted,

JOSEPH WILLIAMS
By his Attorney:

*/s/ Paul Rudof*
Paul R. Rudof
BBO # 643765
Strehorn, Ryan & Hoose
100 Main St. 3rd Floor
Northampton, MA 01060
(413) 586-4800
prudof@strhlaw.com